# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF WEST VIRGINIA
### ELKINS

**TENA WARE,**

      **Plaintiff,**

**v.**                                     **Civil Action No.: 2:10-CV-67**
                                                   **JUDGE BAILEY**

**MICHAEL J. ASTRUE,**
**Commissioner of Social Security,**

      **Defendant.**

## REPORT AND RECOMMENDATION TO THE DISTRICT JUDGE RECOMMENDING THAT THE DISTRICT COURT GRANT IN PART AND DENY IN PART PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT [12], DENY DEFENDANT'S MOTION FOR SUMMARY JUDGMENT [18], AND REMAND WITH INSTRUCTIONS

## I.  INTRODUCTION

On May 24, 2010, Plaintiff Tena Ware ("Plaintiff"), by counsel Scott B. Elkind, Esq., filed a complaint in this Court to obtain judicial review of the final decision of Defendant Michael J. Astrue, Commissioner of Social Security ("Commissioner" or "Defendant"), pursuant to Section 205(g) of the Social Security Act, as amended, 42 U.S.C. § 405(g). (Complaint, ECF No. 1)  On November 9, 2010, the Commissioner, by counsel Helen Campbell Altmeyer, Assistant United States Attorney, filed an answer and the administrative record of the proceedings. (Answer, ECF No. 7; Administrative Record, ECF Nos. 8, 9)  On December 9, 2010, and February 9, 2011, Plaintiff and the Commissioner filed their respective Motions for Summary Judgment. (Pl.'s Motion for

Summ. J., ECF No. 12; Def.'s Motion for Summ. J., ECF No. 18)  Following review of the motions

by the parties and administrative record, the undersigned Magistrate Judge now issues this Report

and Recommendation to the District Judge.

## II.  BACKGROUND

A.     Procedural History

On July 12, 2006,[1] the Plaintiff protectively filed for disability insurance benefits ("DIB"),

alleging disability beginning October 1, 2005.  (R. at 90-95)  Plaintiff's claim was initially denied

on September 15, 2006, and denied again upon reconsideration on December 20, 2006.  (R. at 60-64,

66-68)  On February 21, 2007, Plaintiff filed a written request for a hearing, which was held by

video before a United States Administrative Law Judge ("ALJ") on August 11, 2008.  (R. at 14, 22-

45, 73)  The Plaintiff appeared in Hagerstown, MD, and the ALJ presided over the hearing from

Richmond, VA.  (R. at 14)  On August 28, 2008, the ALJ issued an unfavorable decision to Plaintiff,

finding that she was not disabled within the meaning of the Social Security Act.  (R. at 11-21)  On

March 26, 2010, the Appeals Council denied Plaintiff's request for review, making the ALJ's

decision the final decision of the Commissioner.  (R. at 1-5)  Plaintiff now requests judicial review

of the ALJ decision denying her application for disability.

B.     Personal History

Plaintiff Tena Ware was born February 1, 1954, and was 52 years old at the time she applied

---

[1] The ALJ's decision lists July 12, 2006, as the date that Plaintiff filed her claim.  (R. at 14)  However, Plaintiff's application, listed as Exhibit 2D in the Administrative Record, is dated August 9, 2006.  (R. at 90)

for disability insurance benefits.  (R. at 90)  She graduated from high school in 1971 and has prior work experience in retail sales as a sales associate and manager.  (R. at 105, 110)  The Plaintiff has been married to Ronald Ware since July 10, 1986, and does not have any dependent children.  (R. at 25-26, 90)

C.   Medical History

    1.   Medical Evidence Pre-Dating The Alleged Onset Date of October 1, 2005

Plaintiff's relevant medical history begins on November 20, 2002, when she fell and injured her left wrist.  (R. at 225-26)  She visited the emergency room of City Hospital in Martinsburg, WV, and was diagnosed by Dr. Michael Weigner, M.D., with a fractured left wrist.  (R. at 225)

On December 4, 2001, the Plaintiff visited her family physician, Dr. Karen Rudolph, M.D., after finding a large lump on the base of the left side of her neck.  (R. at 254)  The lump was discovered on November 28, and measured roughly 3 x 4 cm.  Id.  Dr. Karen scheduled a CT scan of the Plaintiff's neck.  (R. at 253)

The Plaintiff visited City Hospital for a CT scan on December 12, 2002.  (R. at 262)  The CT scan revealed a left supraclavicular mass in the region of the brachial plexus, measuring 4.5 x 6.0 cm.[2]  The examining radiologist recommended that the Plaintiff undergo an MRI.  Id.

The Plaintiff underwent an MRI at City Hospital on December 16, 2002.  (R. at 261)  The mass in the Plaintiff's left supraclavicular region measured 4 x 3.2 x 3.7 cm and was located behind

─────────────────────

    [2] The imaging report in the record is incomplete and lacks the second measurement. However, the records of Dr. Becki S. Hill, M.D., of Tri-State Radiation Oncology, state that the CT scan on December 11, 2001 revealed a tumor measuring 4.5 x 6.0 cm.  (See R. at 242)

the sternocleidomastoid muscle, along the top surface of the left subclavian artery and vein.  Id.

Possible diagnoses were scwannoma, neurofibroma, or a soft tissue sarcoma.  Id.  Dr. Rudolph

referred the Plaintiff to a surgeon for biopsy and possible removal of the mass.  (R. at 252-53)

On January 3, 2003, the Plaintiff visited Dr. Allan H. Fergus, M.D., of Winchester

Neurological Consultants for a surgical consult.  (R. at 231-33)  Dr. Fergus reported that the Plaintiff

was seen by a general surgeon, Dr. Strauch, on December 20, 2002, for surgery, but the procedure

was aborted after the Plaintiff developed parasthesias and tingling in her left arm whenever pressure

was applied to the mass.[3]  (R. at 231)  An EMG was performed by Dr. Landrio on January 2, 2003,

which showed "significant involvement" of the C6-7 nerve root, and to a lesser degree the C5-6

nerve root.  (R. at 231, 236-239)  The Plaintiff denied any weakness, numbness, or tingling in her

left arm, and although she did have weakness in her left hand she attributed that weakness to her

fractured wrist.  (R. at 232)  Overall, Dr. Fergus believed that the Plaintiff's left arm sensation was

intact.  (R. at 232)  However, Dr. Fergus determined that, due to the location of the lesion, the

removal procedure would be very difficult and he was not comfortable operating on the Plaintiff.

(R. at 232-33)  Dr. Rudolph then referred the Plaintiff to Dr. Caputy at George Washington

University for surgery.  (R. at 252)

On February 7, 2003, Dr. Anthony Caputy, M.D., removed the mass from the Plaintiff's

neck, which was diagnosed postoperatively as a left brachial plexus schwannoma.  (R. at 358-59)

On February 19, 2003, she returned to Dr. Caputy's office for a followup visit and removal of her

---

[3] The undersigned was unable to locate Dr. Strauch's treatment notes in the record and
has instead relied upon a summary provided by Dr. Fergus.

sutures.  (R. at 353)  Margaret Fiore, N.P, reported that the Plaintiff was receiving physical therapy stretching and strengthening exercises for her left arm three times per week,[4] and was taking Neurontin 300 mg three times a day, Motrin 600 mg every six hours, and, when necessary, Darvocet N 100mg.  Id.  The Plaintiff was also taking Zoloft 50 mg at bedtime to treat depression.  Id.  The Plaintiff did have numbness in all of the fingers of the left hand, worse in the thumb, but was able to flex her fingers and squeeze with the left hand.  Id.  At the time of the followup, the pathology report on the excised mass was incomplete; however, on March 17, 2003, Dr. Caputy reported that, after further consultation, the final diagnosis was that of a synovial sarcoma.  (R. at 352)

On March 20, 2003, the Plaintiff returned to Dr. Caputy for a followup.  (R. at 351)  Dr. Caputy reported that she had lost some of the movement in her extremities, with a weaker grip and only trace movement in the biceps, deltoids, and triceps.  Id.  Due to a diagnosis of synovial sarcoma, Dr. Caputy recommended that the Plaintiff make an appointment with an oncologist and undergo a second MRI and EMG to determine the function of her arm.  Id.  An MRI conducted on March 24, 2003 showed no evidence of residual tumor, and the brachial plexus appeared normal. (R. at 350)

Dr. Rudolph referred her to Dr. Timothy Bowers.  (R. at 249)

The Plaintiff was seen by Dr. Timothy K. Bowers, M.D., an oncologist, on March 28, 2003.

---

[4] The Plaintiff received physical therapy from Todd M. Anderson, OTR/L at City Hospital in Martinsburg, WV, from February 3, 2003 to August 22, 2003.  (R. at 263-324)  An occupational note from the Plaintiff's first session on February 3, 2003, indicated that she lacked full passive range of motion in her shoulder rotation and abduction.  (R. at 324)  On the final progress note included in the record, the Plaintiff's therapist noted that her arm was able to extend way above 90 degrees, albeit with limited arm strength.  (R. at 263)

(R. at 362-63)  Dr. Bowers referred her to Dr. Hill for radiation treatment.  (R. at 363)

Dr. Becki S. Hill, M.D., of Tri-State Radiation Oncology, saw the Plaintiff for an initial consult on April 10, 2003.  (R. at 242-44)  Dr. Hill noted that the Plaintiff's left arm was in a sling, and that she was able to use her left shoulder but had decreased reflexes in her left biceps and numbness in her left hand.  (R. at 244)  Dr. Hill thought she was an excellent candidate for radiation therapy, and recommended a CT scan be scheduled.  Id.

From April 23, 2003 through June 4, 2003, the Plaintiff underwent radiation treatments.  (R. at 240)  A CT scan of the Plaintiff's neck, taken on June 23, 2003, noted abnormal soft tissue near the left clavicle.  (R. at 367)  It was not possible to exclude the possibility of a recurrent tumor, but the abnormality was most likely a postoperative change.  Id.  An MRI of the Plaintiff's chest, taken on July 9, 2003, showed no evidence of a recurrent tumor.  (R. at 245)

The Plaintiff visited Dr. Caputy on June 30, 2003, for a followup examination.  (R. at 349)  Dr. Caputy's report states that the Plaintiff had been receiving bi-weekly physical therapy, with noted improvements except for mild parasthesia in the left upper extremity.  Id.  A motor examination demonstrated less than antigravity strength in all muscle groups on the left, with the deltoids being the strongest muscles at 3/5.  Id.  Dr. Caputy recommended continued occupational therapy, prescribed Neurontin 300 mg for neuropathic discomfort, and recommended a followup MRI in three months.  Id.

On September 19, 2003, Dr. Thomas Lauderman, D.O., a state agency medical consultant, completed a physical residual functional capacity ("RFC") assessment for the Plaintiff's 2003 DIB claim.  (R. at 325-32)  Dr. Lauderman noted on the front page of the assessment "no use of left arm."

(R. at 325) Dr. Lauderman found that the Plaintiff could occasionally lift 50 pounds, frequently lift 25 pounds, stand and/or walk about 6 hours in an 8-hour workday, sit about 6 hours in an 8-hour workday, and push/pull without limitations. (R. at 326) The Plaintiff could frequently climb ramps/stairs, balance, stoop, kneel, crouch, and crawl; and never climb ladders/ropes/scaffolds. (R. at 327) The Plaintiff had limited ability to reach overhead due to her left shoulder, but otherwise found no other manipulative limitations, no visual limitations, and no communicative limitations. (R. at 328-29) The Plaintiff should avoid concentrated exposure to extreme cold and heat, and avoid all exposure to hazards, but otherwise had no environmental limitations. (R. at 329) Dr. Lauderman noted that the Plaintiff was going through physical therapy with slow improvement. (R. at 330)

Dr. Joseph Kuzniar, Ed.D., a state agency psychological consultant, completed a psychiatric review technique form on September 22, 2003, finding that the Plaintiff did not have any severe impairments. (R. at 333-45) Dr. Kuzniar did note some situational anxiety and depression, but also noted that the Plaintiff made no psychological allegations in her claim. (R. at 345) He further found that these impairments presented only mild difficulties in maintaining concentration, persistence, or pace, and that the "C" criteria for Listing 12.06 were not met. (R at 343, 345)

An MRI of the Plaintiff's chest, taken on October 1, 2003, showed no evidence of a recurrent mass in the left supraclavicular region. (R. at 366)

On Octber 13, 2003, the Plaintiff returned to Dr. Caputy for a followup after her MRI. (R. at 347) Dr. Caputy noted that she had gained strength in the deltoid and biceps, and had developed solid antigravity strength in each of those muscles. Id. She was not antigravity in the triceps or wrist extension, and she had 4/5 grasp. Id. Her limitation was in the shoulder, where she had

developed an adhesive capsulitis. Id. A physical examination showed some scarring and contraction of the soft tissue in the neck, and an x-ray of the chest showed that the clavicle had rotated where it was cut and plated during surgery. Id. Dr. Caputy recommended continued physical therapy and another MRI, to be scheduled in three months. Id.

On December 13, 2003, Dr. Fulvio Franyutti, M.D., a state agency medical consultant, completed a physical RFC assessment for the Plaintiff's 2003 DIB claim. (R. at 369-76) Dr. Franyutti found that the Plaintiff could occasionally lift 50 pounds, frequently lift 25 pounds, stand or walk about 6 hours in an 8-hour workday, sit about 6 hours in an 8-hour workday, and push/pull without limitations. (R. at 370) The Plaintiff could occasionally climb ramps, stairs, ladders, ropes, and scaffolds; and frequently balance, stoop, kneel, crouch, and crawl. (R. at 371) The Plaintiff had limited reaching, handling, fingering use of her left hand, no visual limitations, no communicative limitations, and needed to avoid concentrated exposure to extreme cold and hazards. (R. at 372-73)

The Plaintiff visited Dr. Thomas E. Knutson, Jr., D.O., on March 05, 2004, for manipulation of her left shoulder while under anesthesia. (R. at 528) After being administered general anesthesia, the Plaintiff's shoulder was taken through range of motion, with Dr. Knutson successfully achieving 120-130 degrees of flexion. Id. External rotation, however, was very limited, with only 30 degrees of flexion abduction. Id. Internal rotation was 90 degrees. Id.

Dr. Knutson examined the Plaintiff on March 18, 2004, for a checkup. (R. at 527) Dr. Knutson reported that the Plaintiff had 90 degrees of active flexion abduction and 130 degrees of passive flexion abduction. Id.

On May 24, 2004, Dr. Knutson examined the Plaintiff and took x-rays. (R. at 525) He noted

some changes in the humeral head and metaphyseal diaphyseal region that were cystic, and he was unsure if they were post-radiation changes.  Id.  He recommended a bone scan to make sure that the changes were not metastatic.  Id.

The Plaintiff visited City Hospital on Mary 28, 2004, for an EMG.  (R. at 470-71)  The results of the EMG were most consistent with a subacute to chronic left brachial plexopathy which severely involves the lateral cord and moderately to severely involves the posterior cord, but minimally involves the inferior trunk and medial cords.  (R. at 471)  The degree of re-nervation in the proximal muscles suggested that the patient cannot abduct her shoulder due to a "frozen shoulder" rather than a neurologic problem.  Id.

On June 4, 2004, the Plaintiff visited Dr. Knutson to review recently obtained CT scan and bone scan results.  (R. at 525)  No signs of metastatic disease were found.  Id.  Both the bone scan and CT scan showed changes consistent with her previous surgery and some post-radiation changes to her lung apex, all of which was within normal limits.  Id.  Dr. Knutson diagnosed the Plaintiff with adhesive capsulitis of the left shoulder with impingement syndrome, and she agreed to arthroscopic surgery on her shoulder.  Id.

On June 22, 2004, Dr. Knutson performed diagnostic and operative arthroscopic surgery on the Plaintiff's shoulder, with subacromial decompression, resection of the distal clavicle, and capsulotomy.  (R. at 523-24)  She tolerated the procedure well with no complications.  (R. at 524)

On July 26, 2004, the Plaintiff visited Dr. Paul R. Spilsbury, M.D., for a neurology exam. (R. at 469)  The Plaintiff reported some swelling and "fullness" in the clavicular area, but Dr. Spilsbury noted that these symptoms were in the context of being one month post-surgery as well

as recent intensified physical therapy. Id. The Plaintiff's left shoulder was less frozen, with passive and active abduction limited to about 90 degrees. Id. Dr. Spilsbury noted mild edema and coolness of the distal left arm, but normal radial pulses and capillary refill. Id. The Plaintiff's left arm still showed weakness of about 2-3/5 for all the lateral cord and posterior cord, and similar weakness in the external rotators of the left shoulder. Id. Dr. Spilsbury determined that the Plaintiff's Trileptal prescription was not causing the swelling and coolness reported by the Plaintiff, and diagnosed her with a left brachial plexopathy, left frozen shoulder, and left supraclavicular synovial sarcoma in remission. Id. Plaintiff was prescribed Neurontin 300 mg, Zoloft 50 mg, Xanax 25 mg, Bextra 20 mg, and Trileptal 300 mg. Id.

On July 29, 2004, the Plaintiff visited Dr. Knutson, complaining of some swelling in her left arm after a fall. (R. at 520) Dr. Knutson noted that she had 90 degrees of active flexion abduction, and 130 degrees of passive flexion abduction. Id. He felt that the swelling in her arm was due to radiation changes, and recommended an edema sleeve to see if it would help. Id. He also noted that she was getting benefits from physical therapy. Id.

On October 1, 2004, the Plaintiff reported to Dr. Bowers that she felt well but had some edema in her left arm. (R. at 503) She was wearing an edema sleeve from Dr. Knutson. Id. Chest x-rays taken that day showed post surgical and post radiation changes in the upper left chest, but no evidence of pulmonary metastases. (R. at 438)

On October 14, 2004, the Plaintiff visited Dr. Knutson for a followup on her physical therapy and capsulitis. (R. at 518) The Plaintiff had 80 degrees of active flexion abduction and was very stiff in external rotation. Id. Passively, Dr. Knutson was able to get approximately 120 degrees of

flexion abduction.  Id.  Dr. Knutson advised the Plaintiff that she had probably reached a plateau from physical therapy, and a home exercise program might be a good option.  Id.  He also advised the Plaintiff that she could undergo another shoulder manipulation treatment in 2-3 years.  Id.

Dr. Spilsbury performed a followup examination of the Plaintiff on October 26, 2004.  (R. at 386)  Dr. Spilsbury noted that the Plaintiff was a bit discouraged by a continuing lack of range of motion in the shoulder and formarm, dysesthesias in the left radial forearm and hand, and some rheumatism-like soreness and aching about the shoulder.  Id.  The Plaintiff's range of motion in the shoulder was limited to about 70 degrees of passive and active abduction.  Id.  Dr. Spilsbury diagnosed the Plaintiff with modest dysesthesia and pain, and no sleep impairing syndrome.  Id.  He prescribed amitriptyline, Neurontin, Aleve, Zoloft, Xanax, and Levothyroxine.  Id.

An MRI of the Plaintiff's chest taken on November 17, 2004, showed extensive post-surgical and post-radiation changes with fibrosis in the left shoulder region and left lung apex.  (R. at 436) There was no evidence for tumor recurrence and there were no interval changes since her last MRI on August 17, 2004.  Id.

Dr. Bowers examined the Plaintiff on January 7, 2005, at which time she said she felt pretty well.  (R. at 444)  Dr. Bowers noted that her left shoulder abduction was about 80 degrees.  Id.

On April 26, 2005, the Plaintiff visited Dr. Spilsbury for a followup examination.  (R. at 383-84)  There were no overall changes in the Plaintiff's subjective condition; she had the same basic neuritic pain in the left shoulder, numbness in her left hand, and pulling sensation in the left biceps. (R. at 383)  Dr. Spilsbury recommended increasing the Plaintiff's Neurontin dose and substituting Cymbalta for Effexor for depression and pain control.  Id.  The Plaintiff was also considering

shoulder replacement surgery; although Dr. Spilsbury did not object to such a procedure, he did state that any further surgery would be risky and probably would not help with her pain, which in his opinion was neuralgic in origin. Id.

An MRI taken on August 1, 2005, showed no evidence for recurrent sarcoma in the soft tissues of the upper left chest, decreasing edema in the left proximal humeral shaft and left humeral head, and no change in consolidation at the left lung apex. (R. at 425)

X-rays taken of the Plaintiff's left humerus and shoulder on August 25, 2005, demonstrated no fractures. (R. at 423-34) Post surgical changes were noted in the left clavicle. (R. at 424)

On September 8, 2005, the Plaintiff visited Dr. Spilsbury for a followup neurologic exam. (R. at 377) Dr. Spilsbury recommended that the Plaintiff discontinue taking Topamax, resume taking amitriptyline, and begin using a Lidoderm patch. Id. Dr. Spilsbury noted weakness of about 2-3/5 grade for the left lateral cord muscles, left posterior cord muscles, and external rotators of the left shoulder. Id. He also noted hypesthesia and contact parasthesia in those muscle groups. Id.

2.   Medical Evidence Post-Dating The Alleged Onset Date of October 1, 2005

An MRI of the Plaintiff's chest, taken on October 1, 2005, showed that there was decreasing edema in the left humeral head and shaft, no change in consolidation at the left lung apex, and no evidence for recurrent sarcoma in the soft tissues of the upper left chest. (R. at 447)

Dr. Spilsbury examined the Plaintiff on December 8, 2005, reporting that the Plaintiff was doing quite well, especially since beginning treatment with a glove/sleeve for her lymphedema and

renewed physical therapy.[5]  (R. at 385)  However, she did have bad days of burning pain which appeared to be related to inclement weather.  Id.  Her arm mobility had not changed much since her last checkup, with a passive/active abduction of about 60 degrees.  Id.  She had normal radial pulses and capillary refill.  Id.  Her left arm strength was about 2-3/5 grade for all of the left lateral cord, posterior cord, and external rotators of the shoulder, with some atrophy in the infraspinatus muscle, located under the inferior deltoid muscle.  Id.  Her right arm strength was normal.  Id.  Dr. Spilsbury's treatment plan was largely unchanged, but recommended the Plaintiff attempt to subsitute some Lyrica in place of her Neurontin medication.  Id.

On January 6, 2006, the Plaintiff visited Dr. Bowers and informed him that her edema was improved, her pain was better, and she felt well.  (R. at 441)  Her left shoulder abduction was 90 degrees.  Id.

The Plaintiff visited Dr. Bowers on April 7, 2006, and reported that she felt pretty well, had no pain, and her neuropathy was better.  (R. at 440)

The Plaintiff visited Dr. Spilsbury for a checkup on June 8, 2006, reporting that her Lyrica prescription had been very successful in relieving neuritic pain: "[t]his is the best it's felt for a long time."  (R. at 381-82)  She still had problems with limited range of motion in her shoulder and swelling of her arm.  (R. at 381)  She felt that she needed to increase her exercise.  Id.  Dr. Spilsbury noted that the Plaintiff's passive/active abduction was limited to about 60 degrees in her shoulder. Id.  He recommended continuing with her current treatment regimen.  Id.

---

[5] As noted by the Government, the Plaintiff's medical records for her physical therapy and lymphedema treatments are not part of the record.

Dr. Mark A. Landrio, M.D., examined the Plaintiff on July 20, 2006, to evaluate her left upper extremity weakness.  (R. at 455-57)  Dr. Landrio diagnosed the Plaintiff with left brachial plexopathy secondary to spindle cell sarcoma, and possible post-radiation decompensation.  (R. at 457)  The Plaintiff had 0 deep tendon reflexes in her left upper extremity, reduced sensation in the median aspect of the left extremity, and reduced ability to perform rapid alternating movements.  (R. at 457)  Her muscle tone and bulk were normal, and her left upper extremity ranged from 3+/5 to 5/5 strength in all muscle groups.  Id.  Dr. Landrio felt that some of the plexopathy may have been exacerbated by post-radiation injury.  Id.

Dr. Landrio conducted an EMG examination on the Plaintiff on August 4, 2006.  (R. at 545-53)  Dr. Landrio's examination revealed mild atrophy throughout the left upper extremity, ranging from 3+/5 to 5/5 MMI, and a 10% reduction in sensory perception to touch.  (R. at 545, 549)  Dr. Landrio determined that the EMG results were complex and abnormal, with electrophysiologic evidence of a severe chronic left panbrachial plexopathy.  (R. at 551)  The study did not indicate progressive weakness in the left arm because there was no ongoing deinnervation in any of the muscles.  Id.

On September 11, 2006, Dr. Franyutti completed a physical RFC assessment for the Plaintiff's current DIB claim.  (R. at 458-66)  Dr. Franyutti determined that the Plaintiff could occasionally lift 20 pounds, frequently lift 10 pounds, stand or walk about 6 hours in an 8-hour workday, sit about 6 hours in an 8-hour workday, and push or pull without limitation.  (R. at 459)  The Plaintiff could occasionally climb ramps or stairs, never climb ladders/ropes/scaffolds, occasionally balance, occasionally stoop, occasionally kneel, occasionally crouch, and never crawl.

(R. at 460)  The Plaintiff had limited ability to reach in all directions, limited gross manipulation, limited fine manipulation, and limited feeling in her skin; these limitations were confined to the left shoulder, arm, and hand only due to severe lymphedema, limited range of motion, and muscle weakness in the left upper extremity.  (R. at 461)  Her right arm and hand were unlimited in any of the manipulation categories.  Id.  The Plaintiff had no visual limitations and no communicative limitations.  (R. at 461-62)  She was unlimited in her exposure to wetness, humidity, and noise, but was to avoid concentrated exposure to extreme cold, extreme heat, vibration, fumes/odors/dusts/gasses/poor ventilation, and hazards.  (R. at 462)  Dr. Franyutti noted that the Plaintiff had a history of spindle cell sarcoma of the brachial plexus, which was resected and treated with radiation without a recurrence; she continued to have lymphedema of the left upper etremity, left brachial plexopathy secondary to spindle cell sarcoma, and possible post-radiation decompensation.  (R. at 465)

On September 14, 2006, Christine Sias completed a report of contact form for the Disability Determination Section ("DDS"), stating that the Plaintiff could not perform her past work as she described it or as it is described in the national economy because "claimant alleges lymphedema in arm.  Past work required lifting clothing to racks.  Will sent to other work – one armed light jobs." (R. at 166)

On December 15, 2006, Dr. Cindy Osborne, D.O., a state agency medical consultant, reviewed the record in the case and affirmed Dr. Franyutti's RFC assessment without change.  (R. at 467)

E.      Testimonial Evidence

At the ALJ hearing held on August 11, 2008, Plaintiff testified that she was 54 years old, 5'1" tall, and weighs 160 pounds. (R. at 25) She is right-handed. (R. at 25)

The Plaintiff suffers from left arm weakness and pain caused by lymphedema and a frozen shoulder, a result of efforts to remove a tumor from her left brachial plexus. (R. at 29-30) She has numbness in her left thumb, partial numbness in one of her fingers, and a tingling/burning pain in her arm from damage done to the nerves near the tumor site. (R. at 30) She wears a sleeve on her left arm to help with the lymphedema swelling, which she has worn since late 2004. (R. at 29) If she tries to do too much, the lymphedema flares up worse than normal, causing more swelling and arching. (R. at 30, 34) Due to her frozen shoulder, she cannot lift her left arm very high. (See R. at 30) She stated that the doctors told her that her left arm is the best it will get. (R. at 35)

The Plaintiff last worked as a retail supervisor for the Army Air Force Exchange Service, working at a store located on the Air National Guard base in Martinsburg, West Virginia. (R. at 27) She worked in that position for twenty years, quitting in late 2000 or early 2001 because she needed a break from working. (R. at 27-28) Her job involved ordering merchandise, stocking merchandise, and running the cash register. (R. at 31) She has not had a job since working at the Air Force exchange, and her date last insured was December 31, 2005. (R. at 28, 36)

The Plaintiff does not have any trouble walking or sitting. (R. at 28-29) She has a driver's license, and can operate a vehicle whenever she wishes, but when she drives she places her right hand on the lower or middle part of the steering wheel. (R. at 26-27, 31) She can type in a word processor application, but cannot use her left hand because she has no feeling in some of her fingers. Id. She can operate a cash register with just her right arm. (R. at 31–32) She can cook for herself.

(<u>See</u> R. at 32-33)

The Plaintiff testified that she might be able to lift a coffee cup with her left arm. (R. at 32) She can open a mayonnaise jar. (R. at 33) She can lift a five pound sugar bag with her right arm. <u>Id.</u> She can lift a 12-pack of soda with both hands, but cannot lift a case. <u>Id.</u>

The Plaintiff takes Lyrica for her arm pain. (R. at 34) She takes Xanax and Wellbutrin for depression and anxiety. <u>Id.</u> The Lyrica has caused her to gain some weight and causes fatigue. (R. at 35) She gets tired, and spends time laying down or sitting so she can rest her arms on a pillow. <u>Id.</u>

Robert Lester, a vocational expert, also testified at the hearing on August 11, 2008. (R. at 37-44) Mr. Lester testified that the Plaintiff has past relevant work as a sales associate and retail sales manager. (R. at 38) Sales associate work is light duty semi-skilled, and sales manager work is light duty skilled, requiring managerial skills such as scheduling and coordinating activities, gathering, evaluating, communicating information, and some keyboard skills. <u>Id.</u> The ALJ then questioned Mr. Lester about the Plaintiff's potential to perform her past relevant work:

> Q.     I'm going to give you a hypothetical and for that hypothetical, I want you to assume the age, education and work experience of the Claimant. I want you to assume that she suffers from lymphoedema [sic] that causes swelling and pain to the left arm. She's been diagnosed with hypertension, depression, degenerative disc disease. I want you to assume she suffers mild to moderate pain because of a combination of her impairment [sic]. I want you to assume that she can stand and walk six hours, sit six hours. She can lift 10 pounds frequently, 20 occasionally. She has limited gross dexterity and limited fine dexterity, but she can – do you put the keys – the ignition of your – when you put the key into the car ignition, do you use your – I assume your [sic] use your right hand. Correct?

> A.     Yes, sir.

Q. Okay.

A. Yes, sir.

Q. I want you to assume she can drive. She keeps her – she is right-hand dominant and the limitations are to the left arm and hand. She suffers numbness, swelling and pain in that arm. She has some limited gross dexterity and some limited fine dexterity. She can open a mayonnaise jar by using that left hand as a helper and I want you to assume she can use the left hand to help her. I want you to assume she should avoid concentrated exposure for extreme cold and extreme heat and vibration and fumes and odors and smoke. Based on that hypothetical, can the Claimant perform any of her past relevant work?

A. Work as a retail sales manager requires reaching on an occasional basis. There would be – and it's also a light duty position. So yes, sir, I believe that she could perform that work.

Q. Okay. Even if she is limited to using the left arm as a helper?

A. Yes, sir.

Q. And is that the managerial job that you have described?

A. Yes, sir. When you go into the Dictionary of Occupational Titles, reaching in all directions is only required on an occasional basis and that position where it is frequent if you are a sales associate.

Q. Let's say the last part again.

A. It's frequent --

Q. Frequent.

A. – as a sales associate.

Q. Okay.

A. The managerial position is occasional.

(R. at 38-39) The Plaintiff's counsel then cross-examined Mr. Lester, who acknowledged that any

loss of productivity in the range of 15 percent of expected productivity would preclude any work.

(R. at 40)  The Plaintiff gave further information about her employment, stating that although she

was considered a retail supervisor, she did not recommend hiring or firing and she performed all of

the duties of a sales associate.  (R. at 41)  Mr. Lester then opined that, if those facts were true, it

would change his opinion of the Plaintiff's job to be that of a retail sales person, which would

require frequent reaching.  (R. at 42-43)  The ALJ then questioned him as to the Plaintiff's ability

to perform past work with the altered job requirements:

> Q.  Mr. Lester, when you say frequent reaching is required, that does not include the arm which is limited to use only as a helper I assume.  Is that right?
>
> A.  Yes, sir.  Reaching – in the Dictionary of Occupational Titles, the physical requirements ofr reaching mean reaching in all directions.  The Dictionary of Occupational Titles does not break it down any further than that.
>
> Q.  So if she --
>
> A.  Now --
>
> Q.  If she could reach in all directions with one arm and using the other arm as a helper, would that satisfy the frequency requirement of the DOT?
>
> A.  I believe it would.  Because I believe that while there is some overhead reaching in the type of position as a retail sales clerk, most of the reaching is limited to 10 pounds or less and is done at – most of it is not done above shoulder height.
>
> Q.  And if she could do that with the good arm, she would be satisfying that work?
>
> A.  I believe so.  Yes, sir.

(R. at 43-44)

F.    Lifestyle Evidence

The Plaintiff is married and shares a house with her husband.  (R. at 25, 145)  She has two stepdaughters, but they are self-sufficient adults living on their own.  (R. at 25-26)

The Plaintiff prepares meals every day – usually breakfast, sandwiches for lunch, and frozen dinners for supper.  (R. at 145, 147)  She spends some time straightening up her house, feeding the family cats, and every two weeks she does light house cleaning and laundry.  (R. at 145-47)  Her husband helps with these chores.  (R. at 145-47)

The Plaintiff goes outside almost every day.  (R. at 148)  She can go outside alone and drive a car.  Id.  She goes clothes or grocery shopping once a week.  Id.  She can pay bills, count change, handle a savings account, and use a checkbook.  Id.

The Plaintiff enjoys reading and watching TV.  (R. at 149)  She does both of these activities every day, although she has trouble holding a book or newspaper because of weakness in her left arm.  Id.  She spends time with others by talking on the phone a couple times a week, and regularly attends church every week.  Id.

### III.  CONTENTIONS OF THE PARTIES

Plaintiff, in her motion for summary judgment, alleges that the decision of the ALJ is not supported by substantial evidence.  (Pl.'s Mot. for Summ. J. 1, ECF No. 12)  The Plaintiff requests that the Court reverse the decision of the Commissioner and award benefits or, alternatively, remand the case for a new hearing.  Id.  Specifically, Plaintiff argues that:

1.    The ALJ failed to support his step four RFC determination with substantial evidence because:

    •    he did not provide adequate explanation to support his RFC determination;

- he failed to include pertinent functional restrictions in his RFC assessment;

- he failed to provide a meaningful definition of the term "limited" as used in his RFC assessment; and

- he failed to account for the Plaintiff's left upper extremity and weakness.

(Pl.'s Mem. in Supp. of Mot. for Summ. J. 4-8, ECF No. 13)

2. The ALJ failed to support his conclusion that the Plaintiff was capable of performing her past relevant work with substantial evidence because his RFC determination was erroneous and his decision fails to evaluate the opinion of Christine Sias, who determined that the Plaintiff could not perform her past relevant work. (Pl.'s Mem. in Supp. 8-10, ECF No. 13)

In contrast, the Defendant alleges in his motion for summary judgment that the decision denying the Plaintiff's claim for DIB benefits is supported by substantial evidence and should be affirmed as a matter of law. (Def.'s Mot for Summ J.1, ECF No. 18) The Defendant argues that the medical records, objective findings, opinion evidence, and the Plaintiff's own admissions support the ALJ's RFC determination; the ALJ properly evaluated the Plaintiff's subjective complaints of pain and weakness; set forth an adequate narrative discussion regarding his RFC findings; adequately defined the terms used in his RFC assessment; and was not required to adopt the opinions of experts on issues reserved to the Commissioner. (Def.'s Mem. in Supp. of Mot. for Summ. J. 13-22, ECF No. 19) Additionally, the Defendant argues that the ALJ properly relied on the testimony of the vocational expert in determining that the Plaintiff could perform her past relevant work. (Def.'s Mem. in Supp. 22-24, ECF No. 19)

## IV.  STANDARD OF REVIEW

The Fourth Circuit applies the following standards in reviewing the decision of an ALJ in a Social Security disability case:

> Judicial review of a final decision regarding disability benefits . . . is limited to determining whether the findings . . . are supported by substantial evidence and whether the correct law was applied. See 42 U.S.C. § 405(g) ( "The findings . . . as to any fact, if supported by substantial evidence, shall be conclusive . . . ."); Richardson v. Perales, 402 U.S. 389, 390, 91 S. Ct. 1420, 1422 (1971); Coffman v. Bowen, 829 F.2d 514, 517 (4th Cir. 1987). The phrase "supported by substantial evidence" means "such relevant evidence as a reasonable person might accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. at 401, 91 S. Ct. at 1427 (citing Consolidated Edison Co. v. NLRB, 305 U.S. 197, 229, 59 S. Ct. 206, 216 (1938)) . . . . If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence." Laws v. Celebrezze, 368 F.2d 640, 642 (4th Cir. 1966). Thus, it is not within the province of a reviewing court to determine the weight of the evidence, nor is it the court's function to substitute its judgment . . . if the decision is supported by substantial evidence. See Laws v. Celebrezze, 368 F.2d at 642; Snyder v. Ribicoff, 307 F.2d 518, 529 (4th Cir. 1962).

Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990). Because review is limited to whether there is substantial evidence to support the ALJ's conclusion, "[t]his Court does not find facts or try the case de novo when reviewing disability determinations." Seacrist v. Weinberger, 538 F.2d 1054, 1056-57 (4th Cir. 1976). Furthermore, **"the language of § 205(g) . . . requires that the court uphold the decision even should the court disagree with such decision as long as it is supported by 'substantial evidence.'"** Blalock v. Richardson, 483 F.2d 773, 776 (4th Cir. 1972) (emphasis added).

## V. DISCUSSION

A.     Standard for Disability and the Five-Step Evaluation Process

To be disabled under the Social Security Act, a claimant must meet the following criteria:

An individual shall be determined to be under a disability only if his physical or

mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work . . . . "[W]ork which exists in the national economy" means work which exists in significant numbers either in the region where such individual lives or in several regions of the country.

See 42 U.S.C. § 423(d)(2)(A). The Social Security Administration uses the following five-step sequential evaluation process to determine if a claimant is disabled:

(i) At the first step, we consider your work activity, if any. If you are doing substantial gainful activity, we will find that you are not disabled.

(ii) At the second step, we consider the medical severity of your impairment(s). If you do not have a severe medically determinable physical or mental impairment that meets the duration requirement . . . or a combination of impairments that is severe and meets the duration requirement, we will find that you are not disabled.

(iii) At the third step, we also consider the medical severity of your impairments(s). If you have an impairment(s) that meets or equals one of our listings . . . and meets the duration requirement, we will find that you are disabled.

[Before the fourth step, the residual functioning capacity of the claimant is evaluated based "on all the relevant medical and other evidence in your case record . . . ."
20 C.F.R. § 404.1520.]

(iv) At the fourth step, we consider our assessment of your residual functional capacity and your past relevant work. If you can still do your past relevant work, we will find that you are not disabled.

(v) At the fifth and last step, we consider our assessment of your residual functional capacity and your age, education, and work experience to see if you can make an adjustment to other work. If you can make an adjustment to other work, we will find that you are not disabled. If you cannot make an adjustment to other work, we will find that you are disabled.

20 C.F.R. § 404.1520. If the claimant is determined to be disabled or not disabled at any of the five

steps, the process does not proceed to the next step.  Id.

B.    The Decision of the Administrative Law Judge

Utilizing the five-step sequential evaluation process described above, the ALJ made the following findings:

1.    **The claimant last met the insured status requirements of the Social Security Act on December 31, 2005.**  (R. at 16)

2.    **The claimant did not engage in substantial gainful activity during the period from her alleged onset date of October 1, 2005 through her date last insured of December 31, 2005, the period at issue (20 CFR 404.1520(b) and 404.1571 *eq seq.*).**  (R. at 16)

3.    **Through the date last insured, the claimant had the following severe impairments: left supraclavicular synovial sarcoma in remission; left brachial plexopathy; lymphedema to left arm; hypertension; and degenerative joint disease (20 CFR 404.1520(c)).**  (R. at 16)

4.    **Through the date last insured, the claimant did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526).**  (R. at 17)

5.    **After careful consideration of the entire record, the undersigned finds that, through the date last insured, the claimant had the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) except she had limited gross and fine dexterity with her left hand but was able to use it as a helper on a frequent basis; and she needed to avoid concentrated exposure to extreme cold, extreme heat, vibrations, fumes, odors and smoke.**  (R. at 18)

6.    **Through the date last insured, the claimant's past relevant work as retail sales clerk did not require the performance of work-related activities precluded by the claimant's residual functional capacity (20 CFR 404.1565).**  (R. at 20)

7.    **The claimant was not under a disability as defined in the Social Security Act, at any time from October 1, 2005, the alleged onset date, through**

**December 31, 2005, the date last insured (20 CFR 404.1520(f)).** (R. at 20)

C.    The ALJ's RFC Is Not Supported By Substantial Evidence

The Plaintiff's first assignment of error is that the ALJ's RFC assessment is not supported by substantial evidence. (Pl.'s Mem. in Supp. 4-8, ECF No. 13) The Plaintiff bases this argument on four objections to the ALJ's decision:

1.    The ALJ found that the Plaintiff is capable of using her left hand as a "helper hand" on a frequent basis, but failed to provide any explanation of the origin and meaning of that term;

2.    The ALJ failed to make any findings on a number of functional limitations, including the Plaintiff's ability to reach or feel with her left upper extremity and her ability to climb, balance, stoop, kneel, crouch, or crawl;

3.    The ALJ failed to define the term "limited" as used in his RFC assessment, making it impossible to determine the degree of limitation on handling and fingering that the ALJ intended; and

4.    The ALJ failed to address the Plaintiff's left arm pain and fatigue in his RFC assessment.

(Pl.'s Mem. in Supp. 4-8, ECF No. 13) The undersigned Magistrate Judge finds that the ALJ's RFC assessment uses terminology that is not adequately defined in the decision and includes contradictory findings. Consequently, the ALJ failed to support his RFC assessment with substantial evidence, requiring remand of this matter to the Social Security Administration for further proceedings.

The RFC is an assessment of a claimant's ability to do "sustained work-related physical and mental activities in a work setting on a regular and continuing basis. A 'regular and continuing basis' means 8 hours a day, for 5 days a week, or an equivalent work schedule." SSR 96-8p, 1996

WL 374184, at *1 (July 2, 1996). "The RFC assessment must first identify the individual's functional limitations or restrictions and assess his or her work-related abilities on a function-by-function basis, including the functions in paragraphs (b), (c), and (d) of 20 CFR 404.1545 and 416.945." Id. The function-by-function assessment includes an evaluation of physical limitations that may impact the demands of work activity "such as sitting, standing, walking, lifting, carrying, pushing, pulling, or other physical functions (including manipulative or postural functions, such as reaching, handling, stooping, or crouching." 20 C.F.R. § 404.1545(b). Without the initial function-by-function assessment, it may not be possible to determine if the claimant can perform past relevant work at step four of the sequential evaluation process. SSR 96-8p, 1996 WL 374184, at *3 (July 2, 1996). The RFC assessment must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts and nonmedical evidence. Id. at *7. The adjudicator must also explain how any material inconsistencies or ambiguities in the evidence in the case record were considered and resolved. Id.

In this case, the ALJ's RFC determination lacks sufficient clarity to be supported by substantial evidence. First, the undersigned agrees with the Plaintiff that the "helper hand" limitation is too vague. The ALJ's RFC determination states that the Plaintiff "was able to use [her left hand] as a helper on a frequent basis . . . ." (R. at 18) However, the "helper hand" term is not defined in the regulations and the ALJ failed to provide his own definition or explanation.[6] Second,

_____

[6] The undersigned notes that the ALJ hearing transcript provides some rudimentary guidance as to the meaning of the "helper hand" term:

Q.    All right. If you use the other arm as the helper, can you lift a 12 pack of Coke or Pepsi?

the undersigned agrees with the Plaintiff that the ALJ omitted key function-by-function assessments of the Plaintiff's postural limitations. The ALJ specifically found that the Plaintiff "had limited gross and fine dexterity with her left hand," but made no other functional findings other than the "helper hand" restriction discussed above. (See R. at 18) Considering that the "helper hand" limitation is undefined and unexplained, the undersigned is unable to determine if the ALJ intended further functional limitations on the Plaintiff's left arm. Accordingly, the undersigned Magistrate Judge finds that the ALJ's RFC determination is not supported by substantial evidence, requiring remand to address the deficiencies discussed above.

D.      The ALJ's Step Four Determination Is Not Supported By Substantial Evidence

The Plaintiff's second contention is that the ALJ erroneously determined that she could perform her past relevant work. (Pl.'s Mem. in Supp. 8-10, ECF No. 13) The Plaintiff primarily bases her objection on the fact that the ALJ did not address conflicting vocational evidence in the record: a report of contact form, completed by Christine Sias of the Clarksburg, West Virginia, DDS office, stated that the Plaintiff was unable to perform her past work because it required lifting clothing to racks. (See Pl.'s Mem. in Supp. 9; R. at 166) The undersigned Magistrate Judge finds that the ALJ failed to adequately explain the consideration given to this evidence and thus failed to

---

A.      With both hands, is that what you're saying?

Q.      Yes.

(R. at 33) However, this is the only question that the ALJ posed to the Plaintiff using this term, so it is unclear if the ALJ considered the left upper extremity to be used only while lifting (as implied by the question), or for all physical functional abilities, such as carrying, pushing, pulling, or manipulative functioning.

support his disability determination with substantial evidence, requiring remand of this matter to the Social Security Administration for further proceedings.

The Social Security Administration uses medical and other evidence to reach conclusions about an individual's impairments to make a disability determination the effect those impairments have on that individual's ability to work. 20 C.F.R. § 404.1512(a); see also SSR 06-03p, 2006 WL 2329939, at *1 (August 9, 2006). Evidence is anything submitted to, or obtained by, the SSA relating to a person's claim, including:

- objective medical evidence, as defined in § 404.1528(b);

- other evidence from medical sources, such as medical history, opinions, and statements about past treatment;

- statements made by or about a claimant to SSA officials during interviews, on applications, in letters, or in testimony at administrative proceedings;

- information from other sources as described in § 404.1513(d);

- decisions by any governmental or nongovernmental agency about whether a claimant is disabled or blind; and

- any findings made by State agency medical or psychological consultants and other program physicians or psychologists.

20 C.F.R. § 404.1512(b). "Other sources" include, but are not limited to, medical sources not explicitly mentioned under the regulations, educational personnel, public and private social welfare agency personnel, and any other non-medical sources. 20 C.F.R. § 404.1513(d). Social Security Ruling 06-03p provides specific guidance for the level of explanation required for evaluations of

"other source" evidence:

> Since there is a requirement to consider all relevant evidence in an individual's case record, the case record should reflect the consideration of opinions from medical sources who are not "acceptable medical sources" and from "non-medical sources" who have seen the claimant in their professional capacity. Although there is a distinction between what an adjudicator must consider and what the adjudicator must explain in the disability determination or decision, **the adjudicator generally should explain the weight given to opinions from these "other sources," or otherwise ensure that the discussion of the evidence in the determination or decision allows a claimant or subsequent reviewer to follow the adjudicator's reasoning, when such opinions may have an effect on the outcome of the case.**

SSR 06-03p, 2006 WL 2329939, at *6 (August 9, 2006) (emphasis added).

The report of contact form completed by Christine Sias is clearly evidence from an "other source" that should be considered in making the disability determination in this case. See Hester v. Astrue, No. 7:07-CV-125-D, 2008 WL 7663940, at *7 (E.D.N.C. August 11, 2008) (finding that daily activities gleaned from a report of contact form by the ALJ were findings supported by substantial evidence); cf. Wilson v. Bowen, No. Civ. A. 85-3881, 1986 WL 550, at *4, n. 8 (E.D.Pa. Nov. 7, 1986) (noting that the report of contact forms had diminished evidentiary value because the SSA failed to return those forms to the interviewee for inspection, possible correction, and signature). Although Ms. Sias's findings are on a matter reserved to the commissioner, see 20 C.F.R. § 404.1527(e), her findings cannot be ignored in evaluating the Plaintiff's claim. The ALJ was under a duty to ensure that the claimant – or any subsequent reviewing court – can determine the weight afforded to the relevant evidence, and it appears that Ms. Sias's report was overlooked altogether. Accordingly, the undersigned Magistrate Judge finds that the ALJ's step four determination is not supported by substantial evidence, requiring remand to clarify the weight

afforded to the opinion of Ms. Sias.

## VI.  RECOMMENDATION

For the reasons herein stated, I find that substantial evidence does not support the Commissioner's decision denying Plaintiff's application for Disability Insurance Benefits. Accordingly, I recommend that the Plaintiff's Motion for Summary Judgment (ECF No. 12) be **GRANTED IN PART AND DENIED IN PART**, the Defendant's Motion for Summary Judgment (ECF No. 18) be **DENIED**, and the Decision of the Administrative Law Judge be **REMANDED WITH INSTRUCTIONS** that the Commissioner clarify his findings as to the functional limitations of the Plaintiff's left upper extremity and her ability to perform her past relevant work.

Any party may, within fourteen (14) days after being served with a copy of this Report and Recommendation, file with the Clerk of the Court written objections identifying the portions of the Report and Recommendation to which objection is made, and the basis for such objection.  A copy of such objections should also be submitted to the Honorable John Preston Bailey, United States District Judge.  Failure to timely file objections to the Report and Recommendation set forth above will result in waiver of the right to appeal from a judgment of this Court based upon such Report and Recommendation.  28 U.S.C. § 636(b)(1); Thomas v. Arn, 474 U.S. 140 (1985); Wright v. Collins, 766 F.2d 841 (4th Cir. 1985); United States v Schronce, 727 F.2d 91 (4th Cir. 1984), cert. denied, 467 U.S. 1208 (1984).

The Court directs the Clerk of the Court to provide a copy of this Report and Recommendation to all counsel of record, as provided in the Administrative Procedures for Electronic Case Filing in the United States District Court for the Northern District of West Virginia.

Respectfully submitted this **14th day of March, 2011.**

_____
DAVID J. JOEL
UNITED STATES MAGISTRATE JUDGE